IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Terrell McCoy, #256070, | ) | CIVIL ACTION NO. 9:12-0474-MGL-BM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Warden David Michael McCall, | ) | |
| Lieutenant Madden; Nurse Allison Young, | ) | |
| Sergeant Lindsay; Lieutenant Robertson; | ) | |
| Miriam Snyder, Ms. Davis, and | ) | |
| Lieutenant Daniel Harouff, | ) | |
| | ) | |
| Defendants. | ) | |

This action has been filed by the Plaintiff, pro se, pursuant to 42 U.S.C. § 1983.

Plaintiff, an inmate with the South Carolina Department of Corrections (SCDC), alleges violations

of his constitutional rights by the named Defendants.

The Defendants filed a motion for summary judgment pursuant to Rule 56,

Fed.R.Civ.P., on September 17, 2012.[1]  As the Plaintiff is proceeding pro se, a Roseboro order was

entered by the Court on September 27, 2012, advising Plaintiff of the importance of a motion for

summary judgment and of the need for him to file an adequate response.  Plaintiff was specifically

advised that if he failed to respond adequately, the Defendants' motion may be granted, thereby

ending his case.  Plaintiff thereafter filed a response in opposition to the Defendants' motion on

---

[1]Defendants' motion was originally filed on August 22, 2012, but was subsequently removed
from the docket pending completion of discovery.  See Order, Court Docket No. 51.



November 5, 2012, and filed additional materials on November 6, 2012 and November 26, 2012.

Defendants filed a reply memorandum on November 15, 2012.

The Defendants' motion is now before the Court for disposition.[2]

## Background and Evidence

Plaintiff alleges in his original Complaint[3] that on January 17, 2012 he was placed on "crisis intervention" after telling prison officials that he felt like committing suicide. Plaintiff alleges that as part of the property inventory conducted by correctional officers at the time, his legal material was placed inside a green duffel bag and sealed. Plaintiff alleges that after he was taken off of crisis intervention and placed in the SMU (Special Management Unit), he asked for his legal material because he had a pending criminal action, but that as of the time of the filing of this action (Plaintiff's Complaint is dated February 8, 2012) he had not received his legal material. Plaintiff sought immediate release of his legal materials to him. See generally, Plaintiff's Initial Complaint.

Prior to service of this document, Plaintiff filed an amended verified Complaint[4] in which Plaintiff asserted numerous additional claims, primarily relating to an incident that occurred on October 3, 2010. Plaintiff alleges that on that date the Defendants Robertson and Harouff, both correctional officers, approached him in his cell and asked him if he had flooded his cell and hallway

---

[2]This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(d) and (e), D.S.C. The Defendants have filed a motion for summary judgment. As this motion is dispositive, this Report and Recommendation is entered for review by the Court.

[3]Although styled as a Request for a Emergency Injunctive Relief, Plaintiff's initial submission to the Court was filed and docketed as a Complaint.

[4]In this Circuit, verified complaints by pro se litigants are to be considered as affidavits and may, standing alone, defeat a motion for summary judgment when the allegations contained therein are based on personal knowledge. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).



with water.  Plaintiff alleges these Defendants also asked another inmate, Darren Wheelar, whether he had flooded the hallway with water.  Plaintiff alleges that he and the other inmate both responded "no".  Plaintiff alleges that Robinson and Harouff then told him to pack up his property because he was going to be placed in "control cell" status.  Plaintiff alleges that he packed up his property and was waiting in his cell with his back against the wall when Harouff and Robinson returned with several other officers.  Plaintiff alleges that Harouff told him to approach the cell door so that he could be handcuffed, and as he was approaching the door Harouff sprayed him in the face with mace "over five times", following which the officers restrained him "using excessive force".  Plaintiff alleges that he was "slammed" to the floor, that he was hit with a shield, and that handcuffs were placed on him "causing severe injury".  Plaintiff alleges that he was face down on the floor with his arms behind his back and not resisting when Harouff and another officer "placed their knee down hard into Plaintiff's back".  Plaintiff also alleges his face was pushed into the concrete floor, causing severe facial swelling.  Plaintiff further alleges that, because his face was being held down, he could have drowned in the water that was on his cell floor and out into the corridor.[5]  Plaintiff alleges his jumpsuit was cut off of him and he was left naked inside the control cell, while his request to take a shower was denied.  Plaintiff alleges that he was left naked in his cell for five (5) days, and was not provided with a shower for five days.

Plaintiff alleges that several hours after this incident the Defendant Young (a nurse) checked on him.  Plaintiff alleges that he told Young he was not okay and that he suffered from asthma and could not breath, but that Young refused to acknowledge his complaint, failed to document his injuries, and failed to treat him.  Plaintiff alleges that his request to see another nurse

---

[5]Plaintiff alleges that the water on the floor was about two and one half inches deep.



was denied.

Plaintiff further alleges that the Defendants Harouff and Robertson destroyed his personal property, and that he was told by Robertson and a Sergeant "Root" that the items were destroyed because they were wet, although this trial transcript, which was wet, was not destroyed. Plaintiff alleges that his property was dropped in the water deliberately out of retaliation for his having filed previous grievances and lawsuits.

Plaintiff also alleges that on February 23, 2010 he received a discovery motion from his public defender, but the Defendant Davis (a mail room officer) refused to give him copies of crime scene photos that were inside the envelope. Plaintiff alleges that he needed these photos to perfect an appeal of his conviction. Plaintiff alleges he filed a grievance against Davis, which was denied, denying him his right of access to the courts. Plaintiff alleges that the Defendant Snyder, the grievance coordinator, failed to adequately investigate his grievances asserting excessive use of force and denial of access to the courts.

Returning to the events of January 17, 2012, Plaintiff alleges that on that date, he was removed from the general population "for no apparent reason" and was sent to lockup (the SMU). Plaintiff alleges his due process rights were denied when his personal property was improperly packed up by the Defendants Lindsay and another officer. Plaintiff alleges that his previous cell was not secured by the Defendant Lindsay and that his personal property was stolen by other inmates. Plaintiff alleges that being deprived of his personal property, in particular a "walkman", and not being allowed to exercise has caused him to suffer from depression and anxiety. Plaintiff alleges he was confined twenty-four (24) hours a day in the SMU, and was never provided with any individual or group recreation, causing him great distress. Plaintiff alleges he told the Defendant Madden, a



lieutenant, that he needed his legal material from his property bag because he had a pending legal case, but that Madden denied his request. Plaintiff further alleges that Madden placed him in a cell with an inmate that Plaintiff did not want to be placed in a cell with. Plaintiff alleges that he was subsequently placed in a cell on suicide watch "naked", when he should not have been placed on suicide watch. Plaintiff alleges that when he came off of suicide watch the next day he requested that his legal material be returned to him, but it was not. Plaintiff alleges that as a result of this conduct, he missed his "court deadline", and that he did not receive his legal material for over twenty-five (25) days. Plaintiff alleges this was all due to the policies of the Defendant David McCall, Warden of the institution. Plaintiff seeks monetary damages, as well as injunctive and/or declaratory relief. See generally, Verified Amended Complaint.

        In a further amendment to his Complaint filed April 30, 2012, Plaintiff alleges that following the incident on October 3, 2010, the Defendant Harouff placed him back inside the same cell, where the mace was "still on the walls, cell bars and floors". Plaintiff alleges he was "forced to inhale" the mace for five (5) days, causing him to have an asthma attack. Plaintiff also complains that he was forced to drink water from the toilet because the Defendants Harouff and Robertson had turned the water off in his cell. Plaintiff alleges that the Defendant Young refused to recognize that the officers had not permitted him to shower or wash the chemical munitions off of his skin, and that ever since this incident, he has had running and burning sensations in his nose, and that the medication he is receiving has not cured the problem. Plaintiff alleges that he is now seeing a physician and has also received x-rays, but that he is still having drainage and respiratory problems. See Supplemental Pleading filed April 30, 2012.

        In support of summary judgment in the case, the Defendants have submitted an



affidavit from Chad Binkley, who attests that he is an officer at the Perry Correctional Institution

(PCI), where Plaintiff is housed.  Binkley attests that in October 2010 he was assigned to the SMU,

which houses inmates who present a high security risk at a high security level.  Binkley attests that

the SMU is the highest security level and most secure area of the prison, and that inmates are

generally placed in the SMU because of either disciplinary problems or assaultive or violent

behavior.  Binkley attests that on October 3, 2010, the Plaintiff and another inmate flooded out their

cells, and that he [Binkley] was called to be part of an extraction team to remove the Plaintiff from

his cell.  Binkley attests that any time an SMU inmate is removed from his cell, he must be placed

in handcuffs and leg restrains for security reasons.  Binkley attests that once the extraction team was

assembled, Lieutenant Harouff gave the Plaintiff one direct order to come to the cell door to be

placed in handcuffs, but that Plaintiff refused to comply.  Binkley attests that when Plaintiff refused

to come to his cell door to be placed in restraints, Harouff administered a short burst of chemical

munitions[6] into Plaintiff's cell in order to attempt to gain Plaintiff's compliance.  Binkley attests that

chemical munitions are used prior to physical force as there is less risk of physical harm to both the

inmate and officers by the use of chemical munitions.  Binkley attests that Harouff then ordered that

the outer door on the Plaintiff's cell be opened, and that when Plaintiff remained at the back of his

cell and refused to come forward to be placed in handcuffs, Harouff administered another short burst

of chemical munitions into the cell.  Harouff then again directed Plaintiff to come to the cell door

to be placed in handcuffs, but Plaintiff again refused to do so, so another short burst of chemical

munitions was administered into the cell.

---

[6]Plaintiff states that the substance he was sprayed with was "mace".  The record evidence
reflects that the substance used was Saber Red MK-4 #1863722.  See Plaintiff's Exhibit 9 [Report
on the use of force].  Saber Red MK-4 is a form of pepper spray.



Binkley attests that Plaintiff stiff refused to comply, at which time Harouff instructed the extraction team to enter Plaintiff's cell and restrain the Plaintiff. Binkley attests that there were five (5) officers on the extraction team, not including the officer who videotaped the incident. One officer was assigned to the protective shield, while the other four officers were each assigned to take control of one of Plaintiff's limbs. Binkley attests that the officer with the shield, Sergeant Arrowood, entered the cell first and used the shield to pin Plaintiff against the back of the wall. Plaintiff was then placed on the floor so he could be placed into restraints. Binkley attests that officers are trained to place an inmate face down on the ground or floor, as this allows them to gain better control of the inmate and decreases the risk of potential harm to both the officers and the inmate. Plaintiff was placed in restraints and was then removed from the cell and taken to the hallway. Binkley attests that during this process there was a small amount of water on the cell floor and also in the hallway, but that there are drains in the hallway so that any water will drain away and the amount of water present was only a minimal amount.

Binkley attests that once Plaintiff was out of his cell, officers went into his cell to remove his personal property, while other officers removed Plaintiff's jumpsuit and clothing. Binkley attests that Plaintiff was being placed on "control cell" because he had flooded his cell, and that while on control cell inmates are stripped of all personal property. Additionally, Plaintiff's clothing was wet and was also contaminated with chemical munitions. Binkley attests that Plaintiff's uniform was cut off because it could not be removed in any other manner while he was in restraints, and that because of his agitated state, the officers did not want to risk removing his restraints to try and take off the uniform. Binkley attests that it creates a dangerous situation when an agitated inmate has one handcuff removed because the inmate can use the remaining handcuff as a weapon.



Once Plaintiff's clothing was removed, he was returned to his cell.

Binkley attests that after Plaintiff was secured in his cell, his restraints were removed and he was examined by medical personnel because there had been a use of force, defined as any situation where officers are required to place their hands on an inmate. Binkley attests that Plaintiff was not allowed to go to the shower because restraints again would have had to be removed from an inmate who was in an agitated state, but that even though he was not allowed to go to the shower at that time, he had running water in his cell and could decontaminate from the chemical munitions in his cell. Further, a nurse was called, who observed that Plaintiff was able to walk and talk and did not appear to be in any apparent distress. The nurse also instructed Plaintiff to wash off in his cell.

Binkley attests that he did not observe any injuries to the Plaintiff, and does not recall Plaintiff making any complaints about pain or injuries. Binkley further attests that at no time did he strike the Plaintiff, nor did he observe any officer strike the Plaintiff at any time. Binkley attests that the officers used only the minimal amount of force necessary to control the situation, and that the minimal amount of force used was used as a result of the Plaintiff's own actions. See generally, Binkley Affidavit.

The Defendant Daniel Harouff has also submitted an affidavit wherein he attests that he is a Lieutenant at PCI. Harouff attests that on October 3, 2010 Plaintiff was an inmate in the SMU, which houses the highest security level inmates at the prison. Harouff attests that, on that date, he believes there was an incident when medical personnel were distributing medications where the Plaintiff became disrespectful to the nurse and the flap of his cell was closed. Shortly thereafter, he observed water coming out from under the door of Plaintiff's cell, and although he attempted to



shut off the water to Plaintiff's cell, he was unable to do so in time to prevent him flooding his cell.

Harouff attests that inmates will flood their cells by placing toilet paper or other items in the toilet

and repeatedly flushing it, causing the water to backup.  Harouff attests that he instructed Plaintiff

to pack up his property as he was going to be placed on "control cell" status.  Harouff attests that he

does not recall specifically who made this decision, but that he does not have the authority to place

an imate on control cell.  Harouff further attests that when an inmate is on control cell, all property

is  removed from his cell and he is only allowed boxers and a suicide blanket.

Harouff attests that although Plaintiff denied flooding his cell, he observed water

coming from under the door of the Plaintiff's cell and ordered Plaintiff to come to the cell door to

be placed in handcuffs.  Harouff attests that anytime an SMU inmate is removed from his cell, he

must be placed in handcuffs and leg restraints for security reasons.  Harouff attests that, despite

several direct orders, Plaintiff refused to come to the cell door to be placed in handcuffs, so he

obtained authorization to assemble the extraction team.  Harouff attests to the same facts with regard

to Plaintiff's extraction from the cell as does Officer Binkley.  Harouff attests that following this

incident, he did not observe any injuries nor does he recall Plaintiff making any complaints about

pain or injuries, while the nurse who was called observed that Plaintiff was able to walk and talk and

did not appear to be in any apparent distress.  Harouff further attests that he does not have any

advanced medical training, and that he relies on the trained medical professionals at PCI to provide

proper medical care to inmates.

With respect to Plaintiff's personal property, Harouff attests that he does not recall

who removed Plaintiff's personal property from his cell, but that the general procedure would be that

his personal property would be removed and placed into a duffel bag, except for any non-authorized



items. Harouff attests that if items were damaged due to the water, it is possible that these would have been disposed of, but that legal materials would not be destroyed even if they were wet.[7] Harouff further attests that, although Plaintiff appears to state in his Complaint that he had a watch worth one thousand ($1,000.00) dollars that was missing, that inmates are not allowed to have any type of expensive watch and that Plaintiff therefore would not have had such a watch. Harouff attests that if inmates were allowed to have expensive items, this would create serious security concerns because other inmates may attempt to steal the item or use physical force to obtain the item. Harouff attests that he does not know whether Plaintiff had a watch in his possession, but that he would not have had a one thousand dollar watch. With respect to the eighteen (18) Hallmark holiday cards that Plaintiff alleges were destroyed, Harouff attests that these items are obtained from the Chaplin free of charge, and therefore could have been replaced in that manner. Harouff further attests that inmates are not even allowed to have eighteen cards at one time in their possession, and that an excessive amount of cards would have therefore been considered contraband.

With respect to Plaintiff' claims relating to January 17, 2012, Harouff attests that on that date he observed Plaintiff masturbating in the holding cell. Harouff attests that he obtained restraints and that Plaintiff was placed in restraints, following which (to the best of his recollection) he escorted Plaintiff to the SMU. Harouff attests that he also referred Plaintiff to the disciplinary hearing officer (DHO) for charges for masturbation and public exhibitionism. Harouff attests that he did not realize until after this action was filed that charges were never placed against Plaintiff for this offense, and that he is uncertain as to why Plaintiff was not charged for this offense since he

---

[7]As noted, Plaintiff concedes in his verified Amended Complaint that his trial transcript, although wet, was not destroyed.



observed Plaintiff engaging in this conduct in the holding cell.

With respect to recreation, Harouff attests that inmates in the SMU are provided outside recreation for one hour a day, five days per week. There are occasions where recreation is suspended for all inmates due to security reasons, and that inmates may lose their outside recreation if they refuse to stand for count or for other reasons such as failing to stand to be handcuffed to exit the cell, but except in these unusual circumstances inmates are allowed one hour of recreation five days a week. Inmates are also required by regulation to maintain their cell in a specific condition so as to prevent inmates from engaging in such conduct as placing materials in areas that prevent officers from observing the inmate in the cell, and that if an inmate fails to follow these procedures, his recreation can be suspended for that day. Harouff attests, however, that in reviewing Plaintiff's history, it appears that Plaintiff has had recreation on a regular basis while at PCI. See generally, Harouff Affidavit.

The Defendants have also submitted affidavits from Dennis Arrowood, Derrick Nalley, and Randall Root, all of whom attest that they are correctional officers at PCI and were members of the extraction team on October 3, 2010. Arrowood, Nalley and Root all attest to the same facts surrounding Plaintiff extraction from his cell on that date as do Binkley and Harouff. All three of these correctional officers further attests that they did not observe any injuries to the Plaintiff and do not recall Plaintiff making any complaints about pain or injuries, that at no time did any of them strike the Plaintiff or observe any other officer strike the Plaintiff, and that only the minimal amount of force necessary to control the situation was used, all as was a result of Plaintiff's own actions. See generally, Arrowood, Nalley and Root Affidavits.

The Defendant Thomas Robertson has submitted an affidavit wherein he attests that



he was a member of the extraction team on October 3, 2010. Robertson attests to the same facts surrounding this incident and its aftermath as have the other Defendants/Correctional Officers in their affidavits discussed herein, supra. Further, with respect to recreation, Robertson attests that inmates in the SMU are provided outside recreation for one hour a day, five days a week, and otherwise attests to the same facts concerning recreation and Plaintiff's use of recreation as does Harouff in his affidavit. Robertson specifically attests that, in reviewing Plaintiff's history, it appears that Plaintiff has had recreation on a regular basis while at PCI. See generally, Robertson Affidavit.

The Defendants have also submitted an affidavit from Sharron Ostrander, an administrative assistant in the Division of Investigations at the SCDC. Ostrander attests that she is the custodian of certain records of the SCDC, and that in this capacity she has obtained the videotape of the cell extraction of the Plaintiff on October 3, 2010, which has been submitted to the Court as an attachment to her affidavit as Exhibit 1. See generally, Ostrander Affidavit with attached exhibit. As part of the Court's consideration of the Defendants' motion for summary judgment, the undersigned has reviewed this videotape.

The Defendant Allison Young has submitted an affidavit wherein she attests that she was a licensed practical nurse assigned to PCI during the relevant time period.[8] Young attests that she recalls the Plaintiff and examined him on a number of occasions, but has no specific recollection of examining the Plaintiff on October 3, 2010. Young does attest, however, that she has reviewed Plaintiff's medical records, which show that she examined Plaintiff on October 3, 2010 after a use

---

[8]Young apparently is no longer employed by the SCDC.



of force.[9]  Young attests that Plaintiff complained of burning in his genital area from the chemical

munitions, but was observed standing and walking around in his cell and talking with no shortness

of breath noted, and that he appeared to be in no apparent distress.  Young attests that Plaintiff was

advised to wash the affected area in his cell as soon as possible, and that in her opinion Plaintiff was

provided with appropriate medical care when she saw him on October 3, 2010.  See generally,

Young Affidavit.

        The Defendants have also submitted an affidavit from Amy Enloe, another Nurse

Practitioner at PCI, who attests that she has reviewed Plaintiff's medical records concerning the

incident of October 3, 2010, and that in her opinion Plaintiff was provided appropriate medical care

on that date.  Enloe further attests that Plaintiff was seen by medical personnel on a number of

occasions after that date, but that his medical records do not contain any additional complaints in

relation to the incident of October 3, 2010.  See generally, Enloe Affidavit.  In a separate affidavit

from Nadine Pridgen, Director of Health Information Resources at the SCDC, Pridgen attests that

she has attached a copy of Plaintiff's medical records, which set forth Plaintiff's care and treatment

by the SCDC from July 1, 2009 to the present, to her affidavit as Exhibit 1.  See generally, Pridgen

Affidavit, with attached Exhibit (medical records).

        The Defendant Derrick Lindsay has submitted an affidavit wherein he attests that he

is a Sergeant at PCI, and was the dorm Sergeant in the Q-2 Unit where Plaintiff was housed on

January 17, 2012.  Lindsay attests that on that date he was notified by radio that Plaintiff was being

---

[9]The videotape attached to Ostrander's affidavit confirms that Young spoke with the Plaintiff
following the cell extraction.  Young also makes a statement concerning Plaintiff's condition at the
end of the videotape.  See Ostrander Affidavit, attached Exhibit 1.



taken to the holding cell. Lindsay attests that the procedure is that when an inmate is taken to a holding cell, his cell is deadlocked so that no one can get into the cell, including his cellmate. This is done to secure the inmate's property. If the inmate returns to the general population, the cell will be unlocked; however, if the inmate is taken to the SMU, officers will inventory and pack the inmate's property. Lindsay attests that when the property is packed, an officer and supervisor will be present and all items will be inventoried and placed into a duffel bag, which is sealed and placed into storage. Lindsay also attests that inmates are allowed to have a limited number of items in the SMU, and that those items would not be placed into the duffel bag, but would instead be transported to the SMU.

Lindsay attests that he does not specifically recall whether he deadlocked Plaintiff's cell or if he instructed another officer to do so on the date in question, but that regardless of who locked the cell, this would have been done immediately after he was notified that Plaintiff was being taken to the holding cell, as this is the procedure. Lindsay further attests that inmates are issued a legal box, and that legal materials are to be kept in this box, but that it is his recollection that Plaintiff had legal materials which were in a mesh bag. Lindsay attests that any legal materials that were contained in the mesh bag would have been packed into Plaintiff's duffel bag, as it was unclear if they were all legal materials or personal items, and officers would not attempt to go through each of the items to themselves determine if they were personal items or legal items. Lindsay attests that if the items had been contained in a legal box, they would have been taken to the SMU and Plaintiff would have had access to these items. See generally, Lindsay Affidavit.

Defendants have submitted an affidavit from John McBride, who attests that he is an officer at PCI and that on January 17, 2012 was supervising inmates in the cafeteria. McBride attests



that on that date he observed Plaintiff take a tray from the regular food line and give it to another inmate. Plaintiff then walked directly to the diet line and attempted to obtain a diet tray. McBride attests that a food service supervisor informed Plaintiff that he was not on the diet list and refused to provide him a diet tray, following which Plaintiff attempted to re-enter the main serving line for another tray. McBride attests that he advised Plaintiff of what he had observed and informed him that he had voluntarily forfeited his tray for this meal and would not be allowed to get another tray. McBride attests that at that point Plaintiff became loud and belligerent, so he instructed Plaintiff to leave the area. McBride attests that Plaintiff refused to do so, and was immediately sent to the holding cell. McBride attests that he had no further involvement with the Plaintiff after this time, but that he did prepare an incident report concerning this matter wherein it was noted that Plaintiff had another charge already pending against him for masturbation and public exhibitionism, so no additional charges were filed. See generally, McBride Affidavit.

The Defendant George Madden has submitted an affidavit wherein he attests that he is a Lieutenant at PCI, and that he recalls when Plaintiff was brought to the SMU on January 17, 2012. Madden attests that he had no dealings with the Plaintiff prior to his being brought to the SMU and does not know what occurred prior to that time. However, McBride attests that the SMU is used to house inmates who are disciplinary problems or have demonstrated assaultive or violent behavior, and is the highest security level and most secure area of the prison. Madden attests that when the Plaintiff first arrived in the SMU, he was initially placed in the shower so that they could determine the appropriate cell where he would be housed. This determination is made based on custody level, separations from other inmates, and other factors. Madden attests that he was not involved with, and did not make, this decision, but was simply informed by the Captain or



Administrative Lieutenant where the Plaintiff was to be housed.

Madden attests that when he was instructed where to place the Plaintiff, he went to the Plaintiff and informed him where he was going to be placed, at which time Plaintiff refused to go, stating that he did not want to be placed in a double cell. Madden attests that Plaintiff did not state that he had enemies or was at risk, and that Plaintiff did not even know the identity of the other inmate in the cell. Rather, he simply stated he did not want to be placed in a cell with another inmate. Madden attests that he informed Plaintiff that he did not have a choice and would have to go to a double cell, at which time Plaintiff stated "put me on CI, I am going to hurt myself". Madden attests that he then placed the Plaintiff on "control cell", where all of his property was removed and he was stripped down so that he had only his boxers. Madden attests that he does not have the authority to place an inmate on "CI" (crisis intervention), which must be done by mental health personnel. Madden attests that after he placed the Plaintiff on control cell, he notified the Captain, who contacted the on-call mental health counselor. Madden attests that the mental health counselor instructed that Plaintiff be stripped out naked with no boxers and be placed on crisis intervention. Madden attests that this is a decision made by mental health personnel and not security personnel.

Madden attests that once Plaintiff was on control cell and subsequently on crisis intervention, he was not allowed to have any property, including his legal materials. Madden attests that pursuant to the mental health counselor's instructions, Plaintiff was to remain without any property of any kind until he could be seen by mental health personnel the following day. Madden attests that he recalls Plaintiff asking for his legal materials, and that he informed Plaintiff that he was not allowed to have these materials while on crisis intervention. Madden attests that he did not have involvement with the handling of Plaintiff's property, but that in a situation such as this, an



inmate's property would have inventoried and placed into a duffel bag. Madden further attests that inmates are issued a legal box, and that legal materials are to be kept in this box. Madden confirms that if Plaintiff's legal materials were contained in a mesh bag, they would have been packed into his duffel bag since officers would not attempt to go through each of the items to determine if they were personal or legal items. In any event, Madden attests that if the items had been contained in a legal box, the box would have been taken to the SMU, but that Plaintiff still would not have had access to these items because he was on crisis intervention.

Madden also attests that Plaintiff stated that he had a pending legal action and that he had an attorney in the case. Madden attests that he informed Plaintiff that when he was removed from crisis intervention he could send a Request to Staff to Lieutenant Horne about getting his property, and that once Lieutenant Horne stated he could have his property, he would provide it to him. However, Madden does not recall receiving any Request to Staff from the Plaintiff or having any further dealings with the Plaintiff concerning his property. See generally, Madden Affidavit.

The Defendant Helen Davis has submitted an affidavit wherein she attests that she is assigned to the mail room at PCI, and that her job is to handle both incoming and outgoing mail. Davis attests that when inmates receive legal mail, the procedure is that mail room personnel will open the mail in the inmate's presence to confirm there is no contraband or other improper items. Davis attests that while she does not have any specific recollection, that based on her review of mail room records Plaintiff received a letter from the Charleston County Public Defenders Office on February 22, 2010 which contained graphic crime scene photos. Davis attests that mail room personnel have been instructed by the SCDC general counsel that inmates are not allowed to receive crime scene photos that are of a graphic nature. Davis attests that the procedure is that when mail



room personnel see photographs of a graphic nature, the inmate is informed that they will not be allowed to have the photographs, and the inmate can then decide whether the photographs will be sent to their lawyer or to a family member. The inmate would be allowed to have other items contained in the letter, but would not be allowed to have crime scene photos of a graphic nature. Davis attests that she followed the instructions and advice from the SCDC general counsel as to the handling of the crime scene photographs sent to the Plaintiff, and that these photographs were returned to the Charleston County Public Defenders Office on February 23, 2010. See generally, Davis Affidavit.

The Defendant Miriam Snyder has submitted an affidavit wherein she attests that she was the Inmate Grievance Coordinator at PCI, where her job was to review and investigate grievances filed by inmates through the inmate grievance system. Snyder attests that while Inmate Grievance Coordinator at PCI, she handled numerous grievances filed by the Plaintiff, which she processed to the best of her ability and in the same manner in which she processed all other grievances.[10] Snyder attests that all times she acted in accordance with SCDC policy. See generally, Snyder Affidavit.

Finally, the Defendant Michael McCall had submitted an affidavit wherein he attests that he is the Warden at the Lee Correctional Institution, but that during the time period relevant to Plaintiff's Complaint he was the Warden at PCI. McCall attests that while Warden at PCI, he received numerous requests from inmates each day on a variety of issues, and that while it is possible

---

[10]The Defendants do not assert as part of their motion for summary judgment that Plaintiff failed to exhaust his administrative remedies through the SCDC grievance procedure prior to filing this lawsuit.



Plaintiff wrote to him with concerns about a missing Walkman or other issues, he has no independent recollection of receiving any correspondence from the Plaintiff. McCall attests that if he did receive correspondence from the Plaintiff, he would have either looked into the matter or forward it to the appropriate individual for review. See generally, McCall Affidavit.

In a separate filing dated October 9, 2012 (pursuant to an Order of the Court), the Defendants submitted a copy of the SCDC Use of Force Policy (under seal), and also filed with the Court a copy of the remaining policies Plaintiff had requested to review. In their filing cover letter, defense counsel advises that, for security reasons, Plaintiff was not provided a copy of the unrestricted policies to keep in his possession, but that Plaintiff does have access to view these policies because they are available in the prison library. See Court Docket Nos. 69, 71.

As attachments to his memoranda in opposition to the Defendants' motion for summary judgment, Plaintiff has submitted five hundred sixty-four (564) pages of exhibits for consideration by the Court. These documents include affidavits, discovery responses, medical records, grievance documents, and copies of filings in this case. In an affidavit from the Plaintiff, he attests that on October 3, 2010, the prisoner next door to him, Darren Wheeler, flooded his cell because he was upset that there were no biscuits on his dinner tray. Plaintiff denies that he disrespected any nurses on that day. Plaintiff attests that he told Robertson and Harouff that he had not flooded his cell, but was told to pack his property because he was being placed on "control cell" status. Plaintiff attests that this decision was a violation of prison policy, because only the duty Warden had has the authority to place an inmate on control cell. Nevertheless, Plaintiff attests that he packed and placed his property "neatly" on his bed. Plaintiff attests that when Harouff returned to this cell, he was holding a chemical munition can and had already assembled an extraction team.



Plaintiff attests that he never once acted hostile toward the officers, and that when Harouff told Plaintiff to come to the cell door to be handcuffed, he attempted to approach the cell door but Harouff sprayed him with chemical munitions. Plaintiff further attests that when the officers entered his cell, he did not resist being restrained. Plaintiff attests that when he was handcuffed, his right thumb was placed inside the handcuff along with his left wrist, causing severe pain and injury, and that he was subsequently treated by an orthopedic doctor for swelling and pain. Plaintiff attests that he was placed face down in water that had feces and urine in it, and that he remained in this position for over five (5) minutes.

Plaintiff attests that when Harouff cut his uniform and boxers off with scissors, he pulled his boxers through the leg irons with force "hurting me badly", and that during this process his skin was also cut. Plaintiff attests that he was then placed back inside the contaminated cell completely naked. Plaintiff attests that the water was not turned on in his cell at that time, and that no cleaning crew was called to clean the room. Plaintiff attests that he could have been placed inside the shower to wash the chemical munitions off his skin because there are bars in the shower just like they are in the cells, but was not. Plaintiff attests that when Nurse Young arrived, he complained to her about the chemical munitions burning his skin and also told her that he had asthma and could not breath, but that Young ignored his complaints, telling him to use the water on the floor to wash the chemical munitions off of his skin. Plaintiff also attests that he was not provided with a security blanket, boxers, or paper gown when he was placed on control cell in violation of prison policy.

Plaintiff attests that on January 17, 2012, he was placed on segregation (the SMU) by Harouff "for no reason", and that he stayed in segregation from January 17, 2012 until August 8, 2012. Plaintiff attest that in segregation he spend all of his time in his cell with the exception of



forty-five (45) minutes each week for a shower. Plaintiff further complains that he was constrained by leg irons and a waist chain, and was only allowed to use the telephone on weekends for fifteen (15) minutes. Plaintiff attests that he was not masturbating in the holding cell, and asserts that Harouff locked him up out of retaliation because of grievances he had filed against him and Robertson. Plaintiff also attests that when he came into the SCDC he was wearing a Cartier watch, and that there are over one hundred inmates in the SCDC who wear expensive watches, eyeglasses, wedding bands, etc. Plaintiff attests that his watch was lost by Harouff and Robertson, as they were the supervisors in charge, and were supposed to make sure his property was inventoried and packed. Plaintiff also attests that he had thirteen (13) holiday cards in his cell that he had received from family, and that these holiday cards cannot be replaced by obtaining blank cards from the Chaplin. Plaintiff also attests that Harouff and Robertson never provided him with outside recreation in violation of SCDC policy, and that he was denied outside exercise from July 20, 2009 until August 2012. Plaintiff also attests that the Defendant Lindsey did not make sure his door was deadlocked, resulting in other inmates being able to enter his room and steal his Walkman and short pants.

Plaintiff attests that on February 22, 2010 the Defendant Davis sent the crime scene photos that were attached to his Rule 5 Motion of Discovery back to the sender, when she should have sent those photos to the correspondence review committee according to SCDC policy. Plaintiff also attests that McCall allows his employees to violate prisoner's rights, and that he did not act appropriately in dealing with the Plaintiff. See generally, Plaintiff's Affidavit.

### Discussion

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no



genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P. Further, while the Federal Court is charged with liberally construing a complaint filed by a pro se litigant to allow the development of a potentially meritorious case, see Cruz v. Beto, 405 U.S. 319 (1972); Haines v. Kerner, 404 U.S. 519 (1972), the requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleadings to allege facts which set forth a Federal claim, nor can the Court assume the existence of a genuine issue of material fact where none exists. Weller v. Dep't of Social Services, 901 F.2d 387 (4th Cir. 1990). Here, after careful review and consideration of the evidence and arguments submitted to this Court, the undersigned finds and concludes that the Defendants are entitled to summary judgment in this case.

## I.

### (Excessive Force Claim)

Plaintiff's excessive force claim arises out of the incident which occurred on October 3, 2010. On that date, Plaintiff was forcibly removed from his cell by an extraction team after mace or pepper spray was sprayed into his cell. When reviewing an excessive force claim, the Court should consider 1) the need for the application of force, 2) the relationship between the need and the amount of force that was used, 3) the threat to the staff and inmates as reasonably perceived by the prison officials on the basis of the facts known to them, 4) the efforts made to temper the severity of a forceful response, and 5) the extent of the injuries suffered by the prisoner. Whitley v. Albers, 475 U.S. 312, 321 (1986); Majette v. GEO Group, Inc., No. 07-591, 2010 WL 3743364, at



* 6 (E.D.Va. Sept 22, 2010); see Hudson v. McMillian, 503 U.S. 1, 7 (1992) [the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm].

        Here, the evidence before the Court, considered in the light most favorable to the Plaintiff, reflects that on the day in question Plaintiff had been accused by prison guards of having flooded his cell and been told to pack up his property because he was going to be placed on control cell status.[11]  While Plaintiff attests in his affidavit that he never acted hostile toward the officers and was attempting to approach the cell door to be handcuffed when Harouff sprayed him with chemical munitions, the videotape of the incident confirms that, at the least, Plaintiff and Harouff were engaged in a verbal dispute concerning Plaintiff coming to the cell door to be handcuffed at the time the first spray of munitions into the cell occurred.  Silvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810, 818 (4th Cir. 1995)[Explaining that while the party opposing summary judgment is entitled to the benefit of inferences that can be drawn from the evidence, "[p]ermissible inferences must still be within the range of probability" and that "[w]hether an inference is reasonable cannot be decided in a vacuum; it must be considered in light of the competing inferences to the contrary"(internal quotation marks omitted)].  The videotape of the incident shows that when Harouff instructed Plaintiff to come to the cell door to be handcuffed, Plaintiff responded "for what".  When Harouff then told Plaintiff why he was being placed on control cell, Plaintiff again responded "for what",

---

    [11]The videotape of the incident provided to the Court as an Exhibit confirms that the floor of Plaintiff's cell was wet with water.  While Plaintiff denies that he flooded his cell, claiming that another inmate had flooded *his* cell and that Plaintiff's cell only had water in it because of runoff from the other inmate's cell, it is not necessary to resolve this dispute for purposes of determining whether or not excessive force was used against Plaintiff to extract him from his cell.



following which Harouff again told Plaintiff to come to the door and be handcuffed.  He can then be seen administering a burst of chemical spray into the cell through the flap in the door.  When the camera is focused into the cell it shows Plaintiff on the far side of the cell away from the door.  The outer cell door is then opened and the officer can be seen gesturing to the Plaintiff to come forward (Plaintiff's reaction cannot be viewed from the angle of the videotape), following which a second burst of chemical munitions is sprayed into the cell.  Plaintiff is then heard complaining about them spraying chemical munitions into his cell, to which the officer responds that they had instructed him to come to the door.  A third short burst is then administered through the doorway when the extraction team rushes into the cell to secure the Plaintiff.

The video shows the extraction team securing Plaintiff at the far end of the cell, during which it does not appear that Plaintiff resists once he is on the floor of the cell, nor does the videotape show any officer striking or hitting the Plaintiff during the process where he is being handcuffed.  Plaintiff is then picked up and walked out of the cell and placed on the floor in the hall, where his jumpsuit is removed by being cut away with scissors.  Again, it does not appear that Plaintiff resists during this process, nor does the videotape show any officer hitting or striking the Plaintiff during this process.  Plaintiff is held down during this process, but does not appear to be injured.  The video shows a minimal amount of water on the floor in the hall.  Plaintiff is then picked up by the officers and placed back into his cell, the cell door is closed, and Plaintiff stands with his back to the cell door while his handcuffs and leg restraints are removed through the cell door flaps.  Plaintiff is talking to the officers during this process, and is not coughing nor indicating that he had been injured in any way.  One officer is shown standing ready with another can of chemical munitions in the event there is any resistance, but Plaintiff does not display any resistence during this



process and no further chemical munitions are used.  Plaintiff's cell door is then closed.

The next image on the videotape is of Nurse Young at Plaintiff's cell door asking how he is.  The nurse has her mouth covered and coughs several times.  Plaintiff is responding to the nurse but it is not clear from the video recording what he is saying.  He does not, however, appear to be coughing or having any trouble speaking.  The nurse tells Plaintiff to "just wash off really good, okay".  The nurse (the Defendant Young) is then shown on the videotape giving a statement wherein she states that she just checked on the Plaintiff and that he was "doing fine", was having no difficulties breathing, and was able to walk and talk in his cell.  Young states that she advised Plaintiff to clean himself as soon as possible.

The undersigned does not find that the evidence before the Court presents a genuine issue of fact as to whether the amount of force used against the Plaintiff during this incident was sufficient to give rise to a constitutional claim for excessive use of force.  Prisons are dangerous places, and prison officials are entitled to take necessary precautions to protect themselves from risk of harm and injury at the hands of inmates, in particular high security inmates.  When inmates are non-compliant with legitimate instructions and prison requirements, physical force sometimes has to be applied in order to gain compliance and maintain institutional security, the security of prison employees, as well as the inmates themselves.  It is only when the force used under such circumstances is constitutionally excessive that a viable § 1983 claim is presented.  Here, contrary to Plaintiff's statement in his affidavit that he was complying with the officers' directives and that there was no need for any force to be applied, the evidence of the videotape clearly shows that the Plaintiff was verbally sparring back and forth with the officer and was not cooperating with or agreeing with the officer's directive to be handcuffed and removed from his cell.  See, e.g., Riley v.



Honeywell Technology Solutions, Inc., 323 Fed.Appx. 276, 278, n. 4 (4th Cir. 2009)[Holding that Plaintiff's "self-serving contentions" that he was treated unfairly "were properly discounted by the district court as having no viable evidentiary support"]; Nat'l Enters., Inc. v. Barnes, 201 F.3d 331, 335 (4th Cir. 2000)[Holding that a self-serving affidavit was insufficient to survive summary judgment]; King v. Flinn & Dreffein Eng'g Co., No. 09-410, 2012 WL 3133677, at * 10 (W.D.Va. 2012)[Finding no genuine issue of fact where only evidence opposing summary judgment was "uncorroborated and self-serving" testimony], citing Villiarimo v. Aloha Island Air, Inc., 281 F.3d 1054, 1061 (9th Cir. 2002). Further, the videotape clearly shows that upon entry into the cell by the extraction team, the only force used by the extraction team is to hold Plaintiff on the floor while he is handcuffed - no blows or hitting or striking of the Plaintiff is shown. When Plaintiff is then taken outside the cell and placed back on the floor to have his jumpsuit removed, again no striking or hitting of the Plaintiff is shown. This evidence does not reflect that constitutionally excessive force was used by any Defendant. Williams v. Benjamin, 77 F.3d 763, 761 (4th Cir. 1996)[because prison officials are entitled to use appropriate force to quell prison disturbances, and because these officials oftentimes must act under pressure without the luxury of a second chance, in order for a prisoner to prevail on an Eighth Amendment claim he must demonstrate that officials applied force maliciously and sadistically for the very purpose of causing harm]; cf. Wilson v. Flynn, 429 F.3d 465, 469 (4th Cir. 2005)[Lack of evidence that officers used any improper force after restraining a prisoner "distinguishes [Plaintiff's] case from many in which we have held the Plaintiff has alleged an excessive force claim."].

With respect to the use of chemical munitions, the use of mace or pepper spray by prison officials is not a violation of a prisoner's constitutional rights when used appropriately.



Williams, 77 F.3d 763; Peterson v. Davis, 551 F.Supp. 137 (D.Md. 1982), aff'd without op., 729 F.2d 1453 (4th Cir. 1984); Williams v. Dehay, Nos. 94-7114, 94-7115, 1996 WL 128422 **2-3 (4th Cir. March 21, 1996). Indeed, a chemical spray is often used in order to *avoid* having to use physical force, or in an attempt to lessen the amount of physical force necessary. While the evidence does show that over three hundred grams of chemical munitions were used over the course of the incident at issue, the evidence shows that it was used as a spray through a cell door into a cell area, not directly onto the Plaintiff or directly into Plaintiff's face, was used in an attempt to obtain compliance from the Plaintiff in the first instance so that no physical force would have to be used, and then in an attempt to lower Plaintiff's capacity to resist when physical force was determined to be necessary. See Grissom v. Roberts, No. 09-3128, 2009 WL 2601260 at * 6 (D.Kan. Aug. 24, 2009)[Finding that under the circumstances, which included Plaintiff refusing to obey orders, Plaintiff had failed to show that the use of physical force including pepper spray was repugnant to the conscience of mankind]; cf. Whitmore v. Walker, No. 04-837, 2009 WL 900034 at * 9 (S.D.Ill. Mar. 27, 2009) ["[E]ighth Amendment does not require prison guards to engage in physical struggle with an inmate before using chemical mace. Indeed, part of the rationale for using mace is to allow the guards to avoid engaging in physical altercations with an inmate."].

    In sum, the evidence before the Court clearly shows a need for the application of force under the circumstances, and that the extent of force used was only that necessary to diffuse the situation, gain Plaintiff's compliance, and minimize the risk of injury to both the Plaintiff and the prison guards as a result of a physical confrontation brought about by Plaintiff's own conduct. Hudson, 503 U.S. at 7 [the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm]; Bell v. Wolfish, 441



U.S. 520, 540 (1979) ["[N]ot every malevolent touch by a prison guard gives rise to a federal cause of action"]; <u>see also</u> <u>Johnson v. Glick</u>, 481 F.2d 1028, 1033 (2d Cir. 1973) ["not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights"]; <u>Grissom</u>, 2009 WL 2601260, * 6 ["Not every isolated battery or injury to an inmate amounts to a federal constitutional violation"].

Finally, there is also no evidence on the videotape that Plaintiff suffered any injury as a result of the force used against him. Nurse Young attests that she spoke with the Plaintiff and observed no need for any medical care to be provided at that time, nor do Plaintiff's medical records show that he suffered any significant injuries as a result of this confrontation. <u>See</u> Exhibits, Videotape; Young Affidavit; Enloe Affidavit; Medical Records, pp. 30-31; and Sick Call Clinic Notes dated October 3, 2010. Although it is not required that Plaintiff show he suffered more than a <u>de</u> <u>minimis</u> injury to maintain an excessive force claim; <u>see</u> <u>Wilkins v. Gaddy</u>, 130 S.Ct. 1175, 1179-1180 (2010)[Noting that the notion that significant injury is a threshold requirement for stating an excessive force claim was rejected in <u>Hudson</u>, 503 U.S. at 7]; the "absence of [a] serious injury" nevertheless remains relevant in an Eighth Amendment inquiry. <u>Wilkins</u>, 130 S.Ct. at 1179-1180 [holding that the extent of injury may provide some indication of the amount of force applied, and stating that "[a]n inmate who complains of a 'push or shove' that causes no discernible injury almost certainly fails to state a valid excessive force claim"], citing to <u>Hudson</u>, 503 U.S. at 9 (quoting <u>Johnson</u>, 481 F.2d at 1033); <u>see also</u> <u>Ellerbe v. Roach</u>, No. 08-3118, 2010 WL 3361703, at * 3 (E.D.N.C. Aug 24, 2010). As noted, Plaintiff has failed to produce any evidence showing a discernible injury in this case. <u>See</u> <u>Strickler v. Waters</u>, 989 F.2d 1375, 1380-1381 n. 9 (4th Cir. 1993) [the mere incantation of physical or mental injury is inadequate to survive a motion for



summary judgment].

While Plaintiff may conceivably have a state law claim he could assert arising from this incident, or some further administrative remedy he can pursue, the evidence before this Court is not sufficient to create a genuine issue of fact as to whether constitutionally excessive force was used under the circumstances in this case.  See Paul v. Davis, 424 U.S. 693, 701 (1976) [not every claim which may set forth a cause of action under a state tort law is sufficient to set forth a claim for a violation of a constitutional right]; DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 200-203 (1989) [§ 1983 does not impose liability for violations of duties of care arising under state law]; Baker v. McClellan, 443 U.S. 137, 146 (1976) [§ 1983 claim does not lie for violation of state law duty of care].  Therefore, Plaintiff's excessive force claim asserted as a constitutional violation should be dismissed.

## II.

### (Condition of Confinement Claim - Post October 3, 2010 Incident)

Plaintiff alleges that following the cell extraction on October 3, 2010 and his being placed back into his cell, he was not allowed to shower to wash off any residuals of the chemical munitions that were fired into his cell, that his cell itself still contained the remnants of the chemical munitions from when they were initially administered, and that he was not provided with proper medical attention by the medical staff.  After careful review and consideration of the arguments and evidence presented in the light most favorable to the Plaintiff, the undersigned again concludes that a viable constitutional claim has not been presented.

With respect to having been placed back in his cell without being allowed to wash himself, Defendants contend that Plaintiff was fully capable of washing himself off in the sink in his



cell.  Plaintiff argues, however, that the water in his cell had been turned off, and based on the evidence before the Court there is a disputed issue of fact as to whether Plaintiff had running water in his cell.  Plaintiff argues that he should have been allowed to shower after this incident, but the Defendant officers all attest that Plaintiff was not allowed to go to the shower because his restraints would have had to have been removed, which could have led to a greater risk of harm to both the Plaintiff and others.  The fact that a physical confrontation had just occurred is of course not in dispute, and it is difficult for a court to second guess prison officials on such a safety issue involving a high security inmate where there is no evidence of any resulting significant injuries.  Cf. Baldwin v. Stalder, 137 F.3d 836, 841 (5th Cir. 1998)[Finding that security reasons given for not allowing inmates to leave a bus to wash mace off were more than reasonable]; In re Long Term Administrative Segregation of Inmates Designated as Five Percenters, 174 F.3d 464, 469 (4th Cir. 1999) ["Prison officials 'should be accorded wide-ranging deference in adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security'"] (quoting Bell, 441 U.S. at 547); Overton v. Bazzetta, 539 U.S. 126, 132 (2003)  ["We must accord substantial deference to the professional judgment of prison administrators, who bear significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them"]; see also Anderson v. County of Kern, 45 F.3d 1310, 1316 (9th Cir. 1995) [Prison officials have legitimate penological interests in Administrative Segregation, and they must be given "wide-ranging deference" with respect to their need to maintain order, discipline, and "institutional security"], reh'd denied, 75 F.3d 448 (9th Cir. 1995), cert. denied, County of Kern v. Anderson, 116 S.Ct. 306 (1995).

            Hence, Plaintiff has a viable conditions of confinement claim only if the evidence is



sufficient to give rise to a genuine issue of fact as to whether his being placed back into his cell under the circumstances shown demonstrated a deliberate or callous indifference on the part of the prison guards to a specific known risk of harm to the Plaintiff.  Levy v. State of Ill. Dept. of Corrections, No. 96-4705, 1997 WL 112833 (N.D.Ill. March 11, 1997)["A defendant acts with deliberate indifference only if he or she 'knows of and disregards' an excessive risk to inmate health or safety.'"]; see Farmer v. Brennen, 511 U.S. at 837 [A defendant must have engaged in conduct "for the very purpose of causing harm or with the knowledge that harm [would] result"]; Pruitt v. Moore, No. 02-395, 2003 WL 23851094 at *9 (D.S.C. July 7, 2003) [only deliberate or callous indifference on the part of prison officials to a specific known risk of harm states on Eighth Amendment claim], cert. denied, 2004 WL 232748 (4th Cir. 2004); see also Shakka v. Smith, 71 F.3d 162,166 (4th Cir. 1995) [in order to state a constitutional violation, the deprivation alleged must not only be "objectively significantly serious", but the Defendant must also have acted with a "sufficiently culpable state of mind"].  It is not sufficient to merely to show that perhaps one or more of the Defendants may have acted negligently in placing Plaintiff back into the cell where he had originally been, or assumed (or for Nurse Young to have assumed) that the water was on in his cell or that Plaintiff could wash off in his cell.  Grayson v. Peed, 195 F.3d 692, 695 (4th Cir. 1999)["Deliberate indifference is a very high standard - a showing of mere negligence will not meet it."]; A.P. ex rel. Bazerman v. Feaver, No. 04-15645, 2008 WL 3870697 at *12 (11th Cir. Aug. 21, 2008)["[D]eliberate indifference requires a much higher standard of fault than mere or even gross negligence . . . ."].

    Here, the video evidence before the Court reflects that after Plaintiff was placed back in his cell he was conversing with both the prison guards and the nurse without any apparent



difficulty, he does not appear to have been suffering from any significant distress at either time, Nurse Young did not observe or detect any significant problems, and Plaintiff's medical records do not indicate that he required any followup medical treatment as a result of his exposure to chemical munitions on that date. Holley v. Johnson, No. 08-629, 2010 WL 2640328 at * * 9-15 (W.D.Va. June 30, 2010)[noting that while excessive force claim does not require showing of a significant injury, condition of confinement claim does]. Therefore, the evidence does not show a genuine issue of fact as to whether a constitutional violation occurred with respect to this claim. Shakka, 71 F.3d at 166 [in order to state a constitutional violation, the deprivation alleged must be "objectively significantly serious", and the Defendant must also have acted with a "sufficiently culpable state of mind"]; Rish v. Johnson, 131 F.3d 1092, 1096 (4th Cir. 1997) ["only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement"]; Alberti v. Klevenhagen, 790 F.2d 1220, 1228 (5th Cir. 1986) [Eighth Amendment does not require "the provision of every amenity needed to avoid mental, physical, or emotional deterioration."]. Plaintiff can pursue a state law claim for this conduct or seek sanctions for any alleged failure by the Defendants to follow prison policy, if he so chooses, but that does not mean that this claim meets constitutional muster. Cf. Seabrooks v. Cooper, No. 07-3101, 2008 WL 4414250, at * 4 (D.S.C. Sept. 23, 2008).

With respect to Plaintiff's medical complaints, in order to proceed on such a claim Plaintiff must present evidence sufficient to create a genuine issue of fact as to whether any named Defendant was deliberately indifferent to his serious medical needs. Estelle v. Gamble, 429 U.S. 97, 106 (1976); Farmer, 511 U.S. at 837; Sosebee v. Murphy, 797 F.2d 179 (4th Cir. 1986); Wester v. Jones, 554 F.2d 1285 (4th Cir. 1977); Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975); Belcher v.

- 32 -



Oliver, 898 F.2d 32 (4th Cir. 1990). Plaintiff has failed to submit any such evidence. Considered in the light most favorable to the Plaintiff, the evidence reflects that following this incident he was seen by Nurse Young, who did not observe any injuries and noted that Plaintiff was walking around his cell and talking. The only advice she believed was warranted was for Plaintiff to wash himself off as needed. Cf. Cole v. Mistick, No. 05-1476, 2009 WL 3061973 at * * 4-5 (W.D.Pa. Sept. 22, 2009)[Nurse was not deliberately indifferent to inmate who had been sprayed with mace where she only dabbed inmates's face with paper towels rather than following jail policy to use clear water to wash his eyes, wash or instruct pretrial detainee to wash all exposed skin areas, and allow him to change his clothes].

Further, Plaintiff's medical record reflects that when he was seen in the medical department a few days later, it was because Plaintiff's Zoloft (a medication for depression) had not been renewed after Plaintiff had refused treatment, and because he was asking for some type of cream or ointment to help with male pattern hair loss and a receding hairline.[12] Exhibit [Medical Records], pp. 30-31. See Hill v. Dekalb Regional Youth Detention Center, 40 F.3d 1176, 1188-1189 (11th Cir. 1994)["An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed"], overruled in part by Hope v. Pelzer, 536 U.S. 730, 739 n.

_____

[12]While Plaintiff also made a complaint about right wrist pain, the record reflects that he had apparently fractured his wrist in 2009 while playing basketball, and he was being seen for this complaint prior to the incident of October 4, 2010. See Physician's transfer note dated November 16, 2009; see also Medical Record, dated June 9, 2011. On a transfer note dated August 31, 2010, it was noted Plaintiff had fallen on his extended wrist, injured it, and had an appointment scheduled for November 29, 2010, while another prior incident noted again on September 8, 2010 that Plaintiff's wrist was still hurting.



9 (2002).  The clinic notes for the two visits after that (which takes Plaintiff's records through October to November 2, 2010) show that Plaintiff was assessed and treated for complaints of mental health relating to depression.  There is no indication in these medical records of any significant medical problems or issues relating to the events of October 3, 2010, and Plaintiff's own conclusory and self-serving claim that he suffered serious medical problems as a result of this incident are not sufficient to avoid summary judgment.  See Scheckells v. Goord, 423 F.Supp. 2d 342, 348 (S.D.N.Y. 2006) (citing O'Connor v. Pierson, 426 F.3d 187, 202 (2d Cir. 2005) ["Lay people are not qualified to determine...medical fitness, whether physical or mental; that is what independent medical experts are for."]); House v. New Castle County, 824 F.Supp. 477, 485 (D.Md. 1993) [Plaintiff's conclusory allegations insufficient to maintain claim].

In sum, the medical evidence fails to show that Plaintiff suffered any significant injury as a result of the October 3, 2010 use of force or that he had any serious medical need that was ignored by any named Defendant.  This claim is therefore subject to dismissal.  Green v. Senkowski, 100 Fed.Appx. 45 (2d Cir. 2004) (unpublished opinion) [finding that plaintiff's self-diagnosis without any medical evidence insufficient to defeat summary judgment on deliberate indifference claim]; Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987)["Even though pro se litigants are held to less stringent pleading standards than attorneys the court is not required to 'accept as true legal conclusions or unwarranted factual inferences.'"].

### III.

### (Loss of Personal Property)

With respect to Plaintiff's loss of property claims, the undersigned does not find any violation of Plaintiff's constitutional rights in the evidence presented such as to create a genuine



issue of fact on this claim.  Even if this Court assumes as true Plaintiff's allegations that his personal property was lost or mishandled by correctional officers, he has available state court remedies to pursue this claim; <u>see</u> S.C.Code Ann. § 15-69-10, <u>et. seq.</u>; and because South Carolina has an adequate post-deprivation remedy for an alleged deprivation of property, Plaintiff's due process rights were not violated even if it is assumed a correctional officer lost or mishandled his personal property. <u>Hudson v. Palmer</u>, 468 U.S. 517-518 (1984); <u>McIntyre v. Portee</u>, 784 F.2d 566-567 (4th Cir. 1986); <u>Geiger v. Jowers</u>, 404 F.3d 371, 374 (5th Cir. 2005); <u>see</u> <u>also</u> <u>Ricci v. Paolino</u>, No. 91-1994, 1992 WL 63521 at **2 - **3 (1st Cir. April 1992). <u>Cf.</u> <u>Longmoor v. Nilsen</u>, 329 F.Supp.2d 289 (D.Conn. July 23, 2004).

Although prisoners may pursue property deprivation claims against state officials under 42 U.S.C. § 1983 under some circumstances, such as where the deprivation is pursuant to an official policy, such is not the case under the facts and evidence presented here.  There is no allegation, nor any evidence, that any prison policy allows correctional officers to mishandle inmate's personal property.  Indeed, Plaintiff's complaint is that his property was lost, destroyed or stolen because the Defendants *failed* to properly follow established prison policy with respect to the handling of the personal property of inmates.  <u>See</u> <u>Lawrence v. Swanson Inmate Commissary Services</u>, No. 97-6429, 1998 WL 322671 (4th Cir. June 4, 1998) [deprivation claims as a result of negligence fail to set forth a claim of constitutional magnitude]; <u>cf.</u> <u>Davidson v. Cannon</u>, 474 U.S. 344, 347 (1986); <u>Daniels v. Williams</u>, 474 U.S. 327, 331 (1986).  Therefore, Plaintiff's property claim should be dismissed.



## IV.

### (Access to Court Claim)

In Plaintiff's original Complaint filed February 21, 2012, Plaintiff complained that when he was placed on crisis intervention on January 17, 2012, his legal material was taken and secured by correctional officers along with his other personal property, but that after he was taken off of crisis intervention and placed in the SMU, his legal materials were not returned to him. Plaintiff expanded on this claim in his subsequent verified Amended Complaint, stating that he did not receive his legal material for over twenty-five (25) days, and that as a result of this conduct (apparently by the Defendant Madden) he missed a "court deadline". Madden attests in his affidavit that Plaintiff would not have been allowed any property while on crisis intervention, but that he informed Plaintiff that when he was removed from crisis intervention he could send a Request to Staff to Lieutenant Horne about getting his property back, and that once Lieutenant Horne stated he could have his property, he would provide it to him. Madden attests, however, that he does not recall receiving any Request to Staff from the Plaintiff or having any further dealings with the Plaintiff concerning his property. Further, Madden attests that Plaintiff stated that he had an attorney representing him in his pending legal action. See generally, Madden Affidavit.

With respect to this issue, a Report and Recommendation was entered on April 30, 2012 recommending that this claim be dismissed, noting therein that the Defendants had submitted as an exhibit a copy of the Notice of Appeal filed by the Plaintiff in his state case, in which Plaintiff advised the state court that he had to wait approximately thirty (30) days to receive his legal material from property control because he was in the SMU, and that Plaintiff had subsequently been provided his legal materials, none of which Plaintiff disputed. Further, in the Order adopting that Report and



Recommendation,[13] the Court noted that Plaintiff had conceded in an affidavit that, even though he may have initially missed a filing deadline, he was subsequently allowed to file his appeal and was now pursuing his state court appeal.[14] <u>See</u> Order (Court Docket No. 33), p. 3, citing to Court Docket No. 26-1, pp. 10-11.

        In order to proceed with this claim, Plaintiff must have evidence to show that he was prejudiced in a pending court proceeding because of improper conduct or actions by the Defendants. <u>Magee v. Waters</u>, 810 F.2d 451, 452 (4th Cir. 1987) ["Courts have required a showing by a complaining prisoner of actual injury or specific harm to him before a claim of lack of access to the courts will be sustained"]; <u>Gee v. Pacheco</u>, 627 F.3d 1178, 1191 (10th Cir. 2010)["[A] prisoner must demonstrate actual injury from interference with his access to the courts - that is, that the prisoner was frustrated or impeded in his efforts to pursue a nonfrivolous legal claim concerning his conviction or his conditions of confinement."]. Plaintiff has provided no probative evidence, or even argument, to show that any delay in his receipt of his legal materials as a result of his being placed in the SMU and/or on crisis intervention (assuming an improper delay in Plaintiff's receipt of his legal materials actually occurred for purposes for summary judgment) prejudiced him in a pending legal case. <u>Johnson v. Reno Police Chief</u>, 718 F.Supp. 36, 38 (D.Nd. 1989)["Even a <u>pro se</u> plaintiff may not rely wholly on conclusory allegations, but rather must allege facts which, if proven would entitle the plaintiff to relief"]; <u>Hause v. Vaught</u>, 993 F.2d 1079, 1084-1085 (4th Cir. 1993). This

---

     [13]The Order adopting the Report and Recommendation only denied Plaintiff's request for injunctive relief with respect to this issue. Therefore, a ruling still needs to rendered on the underlying merits of this claim.

     [14]Petitioner has filed a petition for writ to the South Carolina Supreme Court from the South Carolina Court of Appeals' Order filed on October 26, 2011, <u>State v. Terrell Lynwood McCoy</u>, Opinion No. 2011-UP-471 (filed on October 26, 2011) [Court Docket No. 59-21].



claim is therefore without merit.  Cochran v. Morris, 73 F.3d 1310, 1317 (4th Cir. 1996) [Dismissal of access to court claim proper where inmate relied on conclusory allegations and failed to identify any actual injury]; see Lewis v. Casey, 518 U.S. 343, 349-353 (1996)[Inmate alleging denial of access to the courts must be able to demonstrate "actual injury" caused by the policy or procedure at issue].

　　　　With respect to Plaintiff's complaint about not being able to receive and retain crime scene photographs, Plaintiff has again provided no evidence whatsoever to show that this prejudiced him in any pending legal case.  Davis attests in her affidavit that these photographs were "graphic crime scene photos" that had been sent to the Plaintiff by his public defender, that inmates are not allowed to have such material in their cells, and that these photos were therefore returned to the Charleston County Public Defender's Office.  Plaintiff states in his affidavit that Davis should have instead sent these photos to the Correspondence Review Committee pursuant to SCDC policy.  However, even assuming Plaintiff is correct about how Davis should have handled these photographs, that does not amount to a violation of a constitutional right.  See Keeler v. Pea, 782 F.Supp. 42, 44 (D.S.C. 1992) [violations of prison policies which fail to reach the level of a constitutional violation are not actionable under § 1983]); Leyra v. Neven, No. 10-84, 2010 WL 4604662 (D.Nev. Nov. 5, 2010)[Dismissing Plaintiff's claims for violation of fourth, sixth, eighth, and fourteenth amendments where Plaintiff alleged that prison officials wrongfully confiscated and permanently deprived him of crime scene photographs].

　　　　No evidence has been presented to the Court to show an injury or harm suffered by the Plaintiff in a pending legal case due to Davis' actions.  Therefore, Plaintiff has failed to establish a viable access to court claim with respect to this allegation, and this claim should be dismissed.



Magee, 810 F.2d at 452 ["Courts have required a showing by a complaining prisoner of actual injury or specific harm to him before a claim of lack of access to the courts will be sustained"]; Johnson, 718 F.Supp. at 38 ["Even a pro se plaintiff may not rely wholly on conclusory allegations, but rather must allege facts which, if proven would entitle the plaintiff to relief"]; Lewis, 518 U.S. at 349-353 [Inmate alleging denial of access to the courts must be able to demonstrate "actual injury" caused by the policy or procedure at issue].

**V.**

**(Remaining Claims)**

The remainder of Plaintiff's assertions are essentially a hodge podge of varying conclusory claims and allegations. To the extent Plaintiff complains about how the Defendant Snyder handled his grievances, arguing that they were not properly considered or investigated, this is not a claim cognizable in this Court in a § 1983 action, as there is no constitutional right to access to a prison grievance procedure. See Adams v. Rice, 40 F.3d 72, 74 (4th Cir. 1994); Buckley v. Barlow, 997 F.2d 494, 495 (8th Cir. 1993) [existence of a prison grievance procedure does not confer any substantive right upon inmates]; Flick v. Alba, 932 F.2d 728, 729 (8th Cir. 1991); Brown v. Dodson, 863 F.Supp. 284 (W.D.Va. 1994) [inmates do not have a constitutionally protected right to a grievance procedure]; Azeez v. DeRobertis, 568 F.Supp. 8, 10 (N.D.Ill. 1982) [even where a state elects to provide a grievance mechanism, violations of its procedures do not deprive prisoners of federal constitutional rights]; Burnside v. Moser, 138 Fed.Appx. 414, 415-416 (3d Cir. June 30, 2005). Therefore, a state's failure to follow its own grievance procedures [even assuming for purposes of summary judgment that that occurred in this case] does not give rise to a § 1983 claim. Spencer v. Moore, 638 F.Supp. 315, 316 (E.D.Mo. 1986) [holding that an inmate grievance



procedure is not constitutionally required]; see also McGuire v. Forr, No. 94-6884, 1996 WL 131130, at *1 (E.D.Pa. March 21, 1996), aff'd, 101 F.3d 691 (3d Cir. 1996) [creation of a grievance system by a state does not create any federal constitutional rights, as prisoners are not constitutionally entitled to a grievance procedure]; Moore v. Sergent, No. 01-1271, 2001 WL 1355298 (6th Cir. Oct. 26, 2001); cf. Sprouse v. Babcock, 870 F.2d 450, 452 (8th Cir. 1989) [prison officials may place reasonable limits on prisoner's access to grievance procedure]. Hence, while Plaintiff may have some further administrative process he can pursue with respect to this complaint, his dissatisfaction with the way his grievances were handled does not give rise to a claim prosecutable in a § 1983 action.

Plaintiff's complaint about being placed in the SMU and/or on suicide watch also fails to state a constitutional claim. Plaintiff has no general constitutional right to placement in any particular prison or to certain privileges, nor does he have any constitutional right to placement in any particular custody classification. See Slezak v. Evatt, 21 F.3d 590 (4th Cir. 1994) [the Constitution vests no liberty interest in inmates retaining or receiving any particular security or custody status as long as the conditions or degree of confinement is within the sentence imposed]; Neal v. Shimoda, 131 F.3d 818, 828 (9th Cir. 1997) ["[A] prisoner does not have a constitutional right to be housed at a particular institution,..., [or] to receive a particular security classification...."]; Neals v. Norwood, 59 F.3d 530, 533 (5th Cir. 1995) ["[A] prison inmate does not have a protectable liberty or property interest in his custodial classification and an inmate's disagreement with a classification is insufficient to establish a constitutional violation."]; Allah v. Burt, No. 08-1538, 2010 WL 476016 at * 4 (D.S.C Feb. 3, 2010); cf. Goins v. Beard, No. 09-1223, 2011 WL 4345874 at * * 4-5 (W.D.Pa. Sept. 15, 2011)["Indeed, every court that has addressed this issue in



Pennsylvania has determined that in the absence of exceptionally long periods of disciplinary custody (exceeding 15 months), prisoners do not have a liberty interest in remaining free from confinement in SMU or similar housing."](citations omitted). Therefore, in order to state a § 1983 claim based on his placement in the SMU and/or on suicide watch alone, Plaintiff would have to present evidence sufficient to show that the Defendants' decisions in his case were arbitrary, capricious, or based on some other unlawful motive. See generally, Sandin v. Connor, 515 U.S. 472, 478 (1995); cf. Marchesani v. McCune, 531 F.2d 459, 462 (10th Cir. 1976), cert. denied, 429 U.S. 846 (1976)[classification generally upheld unless inmate proves arbitrary and capricious or a clear abuse of discretion]; Crowe v. Leeke, 259 S.E.2d 614, 615 (1979).

      Plaintiff has presented no such evidence. Rather, Plaintiff only states in a general and conclusory manner in his Complaint and affidavit that his security placement was "for no reason" and/or was in retaliation by certain prison guards for his previous conduct in the prison. However, these contentions are contradicted by the Plaintiff in his *own* allegations from his original Complaint, wherein he alleges that he was placed on crisis intervention on January 17, 2012 after he "told officers I felt like committing suicide". See Complaint [Court Docket No. 1, p. 17]; see also Crisis Intervention dated January 17, 2012. Further, the Defendants have submitted substantial evidence to show the reasons for Plaintiff's placement in the SMU and for having been placed on suicide watch. In medical records dated February 14, 2012 [Encounter 196], when Plaintiff was stating that he should be allowed to go back to the "yard", he admitted that he was acting out several weeks ago. On January 18, 2012 [Encounter 195], Plaintiff admitted that it was inappropriate for him to demand to be placed in a single cell. On January 5, 2012 [Encounter 191], Plaintiff states that he had recent urges to cut himself and that he cuts himself to feel better and to kill himself. He also stated that he



was anxious and depressed.

While Plaintiff may not agree with these decisions or his classification placements, his own opinion that the Defendants had "no reason" to do so or that his placements were the result of retaliatory conduct do not in and of themselves constitute *evidence* that his incarceration in the SMU and/or his placement on suicide watch were arbitrary, capricious, or based on some other unlawful motive.  See generally Sweet v. South Carolina Department of Corrections, 529 F.2d 854, 859 (4th Cir. 1975) (en banc) [describing federal court's deference to prison administrators and all administrative matters unless the condition rises to the level of a constitutional violation]; Beverati v. Smith, 120 F.3d 500 (4th Cir. 1997) [Inmate's confinement in Administrative Segregation does not impose such an atypical hardship so as to implicate a liberty interest]; Jones v. Walker, 358 Fed. Appx. 708, 712 (7th Cir. 2009)[Inmates do not have a liberty interest in avoiding placement in discretionary segregation, meaning "segregation" imposed for administrative, protective, or investigative purposes]; see also Morgan v. Church's Fried Chicken, 829 F.2d 10, 12 (6th Cir. 1987) ["even though pro se litigants are held to less stringent pleading standards than attorneys, the Court is not required to 'accept as true legal conclusions or unwarranted factual inferences'"]; Woods v. Edwards, 51 F.3d 577, 580-581 (5th Cir. 1995) [summary judgment affirmed where inmate offered no evidence other than his personal belief that the alleged retaliatory actions were based on his exercise of his rights]; Atkinson v. Bohn, 91 F.3d 1127, 1129 (8th Cir. 1996) (per curiam) [speculative and conclusory allegations cannot support retaliation claim]; Wright v. Vitall, No. 91-7539, 1991 WL 127597 at**1 (4th Cir. July 16, 1991) [Retaliation claim based on mere conclusory statements cannot withstand defendants' summary judgment motion]; LaCroix v.Williams, No. 97-0790, 2000 WL 1375737 at *4 (W.D.N.Y. Sept. 21, 2000) ["Plaintiff's conclusory allegations aside,



there is simply nothing in the record to support his version of the facts and plaintiff's claim for retaliation fails"]; Harris v. Ostrout, 65 F.3d 912, 916 (11th Cir. 1995)[case dismissed where Plaintiff produced nothing beyond his own conclusory allegations suggesting that prison official's actions were motivated by a retaliatory animus].

        With respect to Plaintiff's complaints about the conditions of his confinement, during the time period set forth in the complaint Plaintiff was a prisoner in a state correctional facility, not a hotel. Lunsford v. Bennett, 17 F.3d 1574, 1581 (7th Cir. 1994); Hadley v. Peters, No. 94-1207, 1995 WL 675990 *8 (7th Cir. 1995), cert. denied, 116 S.Ct. 1333 (1996) ["prisons are not required to provide and prisoners cannot expect the services of a good hotel."] (quoting Harris v. Fleming, 839 F.2d 1232, 1235 (7th Cir. 1988)).  It should be expected that conditions in such a setting are oftentimes less than ideal, and Plaintiff has presented no evidence to show that he was not provided with at least the "minimal" necessities required. Rish, 131 F.3d at 1096 ["only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement"]; Alberti, 790 F.2d at 1228 [Eighth Amendment does not require "the provision of every amenity needed to avoid mental, physical, or emotional deterioration."].  The conclusory allegations contained in Plaintiff's Complaint and his affidavit about the general conditions of his confinement are not in and of themselves sufficient to maintain a constitutional claim. Cf. Beverati, 120 F.3d at 504 and n. 4 [accepting Plaintiff's allegations for purposes of summary judgment that cells were unbearably hot, infested with vermin, smeared with human feces and urine, flooded with water from a leaky toilet above, and where food provided was cold and provided in smaller portions, but holding that such conditions were not "so atypical that exposure to them for six months imposed a significant hardship in relation to the ordinary incidents of prison life."].

- 43 -



Plaintiff claims that he was placed in a stripped out cell with only minimal accessories, had limited telephone privileges and limited opportunity to exercise outside of his cell, that he was only allowed forty-five (45) minutes each week to shower, and was required to be in restraints whenever outside of his cell.  However, while living standards in maximum security are necessarily austere and highly restrictive, such conditions are a consequence of prison life and are imposed in order to ensure to the maximum extent possible a safe environment for both staff and inmates.  See generally, Bell, 441 U.S. at 559 [finding that body cavity searches are reasonable under the Fourth Amendment because in prisons the "[s]muggling of money, drugs, weapons, and other contraband is all too common an occurrence"]; Allah, 2010 WL 476016 at * 4; see also Forbes v. Trigg, 976 F.2d 308 (7th Cir. 1992) (collecting cases), cert. denied, Trigg v. Forbes, 507 U.S. 950 (1993); Peckham v. Wisconsin Dep't of Corrections, 141 F.3d 694 (7th Cir. 1998) [strip searches constitutional absent evidence they were performed for purposes of harassment or punishment]; Franklin v. Lockhart, 883 F.2d 654 (9th Cir. 1989) [approving twice-a-day visual body cavity searches for inmates in disciplinary and administrative segregation]; Michenfelder v. Sumner, 860 F.2d 328, 332-333 (9th Cir. 1988) [strip searches when entering and leaving cells not excessive even if prisoner escorted from one portion of a unit to the next]; Ramirez v. McCaughtry, No. 04-335, 2005 WL 2010173 (W.D.Wisc. 2005) [upholding policy that restricted access to newspapers, magazines, and photographs to inmates in segregation as part of an incentive system for good behavior]; Chavarria v. Stacks, 102 Fed.Appx. 433, 436-437 (5th Cir. July 20, 2004)[policy of constant illumination was reasonably related to the legitimate penological interest of guard security and enforcement of the policy did not violate the Eighth Amendment].

Plaintiff's complaints about the conditions of his confinement, without any evidence



of evil motive or a showing of compensable injury, are simply not enough to establish a constitutional claim. Anderson, 45 F.3d at 1316 [Prison officials have legitimate penological interests in Administrative Segregation, and they must be given "wide-ranging deference" with respect to their need to maintain order, discipline, and "institutional security"], reh'd denied, 75 F.3d 448 (9th Cir. 1995), cert. denied, County of Kern v. Anderson, 116 S.Ct. 306 (1995); Estrada v. Kruse, 38 Fed. Appx. 498-499 (10th Cir. 2002)[No Eighth Amendment violation where Plaintiff was placed in stripped basement cell for 5 days where he suffered no injury and he did not show Plaintiffs had evil motives or intent]; Kidwell v. Buchanan, No. 93-15056, 1993 WL 230224 at **1 (9th Cir. June 29, 1993) [Where temporary restriction of amenities was found not to be cruel and unusual punishment]; Tarney v. Boles, 400 F. Supp.2d 1027, 1040 (E.D. Mich. 2005)[inmate's loss or restriction of telephone privileges for disciplinary reasons is not considered an atypical significant hardship, even when the disciplinary charges are allegedly false, and therefore does not implicate a liberty interest protected by due process]; Papadakis v. Director, No. 08-670, 2010 WL 1753358 at * 2 (E.D.Tex. Apr. 8, 2010)["[B]eing placed in disciplinary confinement, losing commissary and property privileges for thirty days, and remaining at the same time earning class are not sanctions which impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."] (quoting Sandin, 515 U.S. 472); Weens v Lawrence, No. 09-65, 2009 WL 2422795 at --- 2-3 (S.D.Ga. Aug, 6, 2009)[shackling pre-trial detainee during exercise did not violate Fourteenth Amendment]; Ruffino v. Lawrence, No. 08-1521, 2010 WL 908993 at * 5 (D.Conn. Mar. 9, 2010)[citing numerous cases upholding inmates being required to wear restraints during exercise and finding no contrary decisions]; Shakka v. Smith, 71 F.3d 162, 166 (4th Cir. 1995)["In the context of a conditions-of-confinement claim, to demonstrate that a deprivation is extreme enough



to satisfy the objective component of an Eight Amendment claim, a prisoner must 'produce evidence of a serious or significant physical or emotional injury resulting from the challenged conditions', or demonstrate a substantial risk of such serious harm resulting from the prisoner's unwilling exposure to the challenged conditions"]; <u>Chavis v. Fairman</u>, No. 94-1503, 1995 WL 156599 at — 5-6 (7th Cir. Apr. 6, 1995)["Generally, even dramatic restrictions on outdoor exercise do not violate [the due process clause] so long as prisoners have ample opportunity to enjoy indoor activity."];[15] <u>Isaac v. Fairman</u>, No. 92-3875, 1994 WL 63219, * 5-6 (N.D.Ill. 1994) [allegation that prisoner was provided only one uniform and denied adequate opportunity to wash did not state claim]; <u>Holley</u>, No. 08-629, 2010 WL 2640328 at * * 9-15 [noting that while excessive force claim does not require showing of a significant injury, condition of confinement claim does]; <u>Eady v. Sawyer</u>, No. 02-1225, 2005 WL 2206249, at *5 (S.D.Ill. Sept. 12, 2005) [case dismissed where, although Plaintiff may have experienced some discomfort, he made no viable claim of physical harm suffered due to temporary lack of mattress or pillow]; <u>Wilson v. Cook County Bd. of Commissioners</u>, 878 F.Supp. 1163, 1167-1168 (N.D.Ill. 1995) [pretrial detainee failed to establish that overcrowding, inadequate staffing, inadequate opportunity for exercise, and inadequate grievance procedures in detention facility violated detainee's due process rights, as detainee failed to allege remedial injury].

By reaching the conclusion that no compensable constitutional violation has been shown in the evidence presented to this Court, the undersigned does not intend to signal a lack of

---

[15]Medical records on June 14, 2011 show that Plaintiff had been "doing exercises (push ups etc.) in room." Encounter 126. The recreation logs for this period also show continuous dates throughout where Plaintiff was denied recreation time for various repeated infractions, including failure to stand for counts, door being covered, not dressed, and not being in compliance with PCI SMU inmate standards.



concern over Plaintiff's complaints about the conditions under which he is being held. However, even assuming that some prison policies or procedures may have been violated with respect to his placement decisions (which Plaintiff appears to allege), that is not by itself a constitutional question. See William v. Ozmint, No. 08-4139, 2010 WL 3808621 at * * 2-3 (D.S.C. July 22, 2010)[Plaintiff, who did not allege any loss of good time credits as a result of his placement in SMU, failed to show he was deprived of life, liberty, or property interest] adopted by, 2010 WL 3814287 (D.S.C. Sept. 23, 2010); Bacchus v. Dean, No. 09-1226, 2010 WL 2991708 at * * 4-5 (D.S.C. July 8, 2010)[Inmate failed to show that his placement in SMU, without a hearing and without disciplinary charges, violated his due process rights], adopted by, 2010 WL 299170 (D.S.C. July 28, 2010; Scott v. Hamidullah, C/A No. 3:05-3027-CMC-JRM, 2007 WL 904803 *5 n.6 (D.S.C. March 21, 2007) (citing Riccio v. County of Fairfax, Virginia, 907 F.2d 1459, 1469 (4th Cir. 1990)); Johnson v. S.C. Dep't of Corrections, No. 06-2062, 2007 WL 904826 at *12 (D.S.C. Mar. 21, 2007) ["Plaintiff's allegation that defendants did not follow their own policies or procedures, standing alone, does not amount to a constitutional violation."] (citing Riccio, 907 F.2d at 1469 [if state law grants more procedural rights than the Constitution requires, a state's failure to abide by that law is not a federal due process issue]; Keeler, 782 F.Supp. at 44 [violations of prison policies which fail to reach the level of a constitutional violation are not actionable under § 1983]).

While Plaintiff may have some state law claim or administrative process he could pursue with respect to the conditions complained about, in the absence some evidence of a significant injury suffered by the Plaintiff as a result of conditions deemed to be unconstitutional, or other accompanying factors not present in this case, the undersigned does not find that Plaintiff has presented a genuine issue of fact as to whether his *constitutional* rights have been violated



sufficient to survive summary judgment. <u>Holley</u>, No. 08-629, 2010 WL 2640328 at * * 9-15 [noting that while excessive force claim does not require showing of a significant injury, condition of confinement claim does]; <u>see</u> <u>DeShaney</u>, 489 U.S. at 200-203 [§ 1983 does not impose liability for violations of duties of care arising under state law]; <u>Baker</u>, 443 U.S. at 146 [§ 1983 claim does not lie for violation of state law duty of care]; <u>see Paul</u>, 424 U.S. 693, 701 (1976) [not every claim which may set forth a cause of action under a state tort law is sufficient to set forth a claim for a violation of a constitutional right].

<u>**Conclusion**</u>

Based on the foregoing, it is recommended that the Defendants' motion for summary judgment be **granted**, and that this case be **dismissed**.

The parties are referred to the Notice Page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

January 24, 2013
Charleston, South Carolina



## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
Post Office Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

– 49 –
